**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NNEMDI EMENIMADU | : CIVIL ACTION NO. |
| 107 REESE STREET | : |
| SHARON HILL, PA 19079 | : |
| PLAINTIFF, | : |
| | : |
| V. | : |
| | : JURY TRIAL DEMANDED |
| DIGNIFY HOMECARE SERVICES, LLC | : |
| 4619 STATE ROAD | : |
| DREXEL HILL, PA 19102 | : |
| DEFENDANT. | : |

COMPLAINT IN CIVIL ACTION

JURISDICTION

1. This Complaint is brought pursuant to the Americans with Disabilities Act

(ADA) and the Americans with Disabilities Act as Amended (ADAAA).

Jurisdiction is appropriate pursuant to 28 U.S.C. S 1331.  The plaintiff

invokes the Federal Court's jurisdiction over her supplemental state law

claims pursuant to 28 U.S.C. Section 1367.

VENUE

2. Venue is appropriate in the United States District Court for the Eastern

3. District of Pennsylvania because both parties are located in Pennsylvania, in

1

Delaware County and the defendant does substantial business in Delaware County and in Philadelphia County.

## PARTIES

4. The plaintiff is an adult resident and citizen of the Commonwealth of Pennsylvania, who resides at the address indicated in the caption above.

5. The defendant, Dignify Homecare Services, LLC is a privately owned business, which has a business office in the Commonwealth of Pennsylvania, which has an address as indicated in the caption above. The defendant operates its activities from the address indicated above, however it provides services and does substantial business in Delaware County and in Philadelphia County, where it provides in home health care services.

## ADMINSTRATIVE AGENCY REQUIREMENTS

6. The plaintiff filed a charge of discrimination against the defendant with the United States Equal Employment Opportunity Commission (EEOC) at Charge No. 530-2026-00344, for which she received a Right to Sue Letter dated March 18, 2026.

FACTUAL ALLEGATIONS

7.  The plaintiff is disabled based on her medical conditions, including physical and psychological conditions.

8.  The plaintiff suffers from the following medical conditions: (1) post-traumatic stress disorder (PTSD); major depression; anxiety; gastrointestinal disorders; and microcytic anemia; the plaintiff has and does receive medical treatment for her foregoing medical conditions.

9.  The plaintiff's medical conditions, identified in the preceding paragraph, substantially limit her major life activities, including, but not limited to substantially limiting her ability to tolerate stress, her ability to concentrate, her ability to properly digest food, her ability to properly absorb food, sustenance and nutrients, her ability to excrete water, and her ability to produce hemoglobin.

10. The plaintiff was diagnosed with the medical conditions indicated in paragraph 7 above in/around 2019.

11. The plaintiff began working for the defendant (from hereinafter, "Dignify" or "the defendant") in 2019, after the defendant hired her as a secretary. The plaintiff knew the defendant's owner, through her mother, who was

friends with the owner.

12.  After the plaintiff was hired, the defendant's owner, Ms. Orumwense

(from hereinafter, "the owner" or "Orumwense"), who was also the

plaintiff's supervisor, required that she perform duties other than those of

a secretary, without additional compensation;  these extra duties included

that the plaintiff was required to perform home health aide (HHA) duties,

for which Orumwense provided the plaintiff with virtually no training or

guidance to perform.

13.  The plaintiff was required to cover the shift of another HHA who was not

available to work their shift.

14.  The plaintiff was not given a job description for her duties as a secretary or

otherwise.

15. As a part of the plaintiff's duties, Orumwense had her schedule the HHA's

shifts, where they would report to the defendant's client's homes to

provide home health care services; Orumwense also tasked the plaintiff to

ensure the HHAs' work hours were properly documented, including

according to the legal provisions of the Commonwealth of Pennsylvania

from which the defendant received its certification to operate in the

4

Commonwealth of Pennsylvania, and which provided funding to the defendant; the defendant used this funding to pay its employees for the hours they worked.

16. Orumwense required that the plaintiff use the Commonwealth of Pennsylvania's ("the Commonwealth") "Electronic Visit Verification" (EVV) and its "Interactive Voice Response (IVR) systems to document her employees' time; the aforementioned systems were to be used to document the HHAs' arrivals and departures from their work assignments (client's homes) (this was a Commonwealth requirement).

17. In/around 2019-2020, the plaintiff reported to Orumwense, that the HHAs were repeatedly not properly documenting their arrivals and departures from client's homes/their work assignments, as the Commonwealth required; Orumwense appeared ambivalent to what the plaintiff reported to her; the combination of the violations that the plaintiff detected and Orumwense's apparent ambivalence to her reporting thereof, caused the plaintiff to experience substantial increased stress in the performance of the duties Orumwense had her perform.

18. The increase work related stress summarized in the preceding paragraph overlapped into the plaintiff's personal home life, wherein she is a mother, which Orumwense knew.

19. In/around March 2020, the plaintiff asked Orumwense if she could leave work a little early, approximately ten minutes, to catch a trolley – the plaintiff was not asking to be compensated for time she did not perform work for, and Orumwense knew that she could simply take ten minutes worth of pay from the plaintiff's check, if she wanted to; if the plaintiff missed the trolley, she would have to wait an inordinate amount of time for the next one, which Orumwense understood; rather than allowing the plaintiff to leave early, Orumwense heatedly, falsely accused the plaintiff of trying to get paid for time she did not work.

20. While Orumwense was knowingly falsely accusing the plaintiff of trying to get paid for work she had not performed, she laxly and intentionally allowed her HHAs to repeatedly get paid (through funding she received from the Commonwealth) for work that she knew that had not performed, because they falsified the time they worked – essentially Orumwense allowed them to "steal time" in violation of the Commonwealth's rules and

protocols.

21.  By the time the incident described and summarized in paragraphs 18-19 above had occurred in 2020, the plaintiff had told Orumwense (in 2019) about her medical conditions, including her diagnoses indicated in paragraph 7 above, and how they affected her functioning (her major life activities), as well as that she was receiving psychiatric treatment and medical treatment for them.

22.  In 2019, the plaintiff also told Orumwense about stressors and triggers that aggravated her psychological disorders, which Orumwense indicated she understood – Orumwense agreed with the plaintiff's assessment, that she could perform her duties best in a work environment which fostered low-stress and minimized overwhelm, which Orumwense agreed to make happen; based on the substance and tenor of the conversation, it appeared that both the plaintiff and Orumwense were of the mindset that the defendant was discussing and approving reasonable accommodations for the plaintiff's disabilities.

23.  From the time that the plaintiff told Orumwense about her medical

conditions, their effects on her, and her treatment for them, the defendant

perceived and considered her to be disabled, psychologically disabled, until

the plaintiff's employment with the defendant was ended,

24. Within 300 days of the date that the plaintiff filed a charge of

discrimination with the United States Equal Employment Opportunity

Commission (EEOC), on/around October 14, 2025, the defendant, including

through and by Orumwense and her employees, intentionally engaged in

conduct against the plaintiff which it knew would exacerbate her

psychological conditions, for the purpose of discriminating against her and

harassing her, and with the knowledge that their actions would cause her

psychological harm, which did occur.

25. The facts alleged above which do not fall within the respective statutes of

limitations for the plaintiff's claims of disability discrimination, defamation

and invasion of privacy, are included hereto for context, with the exception

that the Court determines that they are part of a continuing violation of

disability discrimination.

8

26.  In 2019, the plaintiff left employment with the defendant, however, she was rehired by it in 2020 as a secretary.

27. As of late 2024 and 2025, and within 300 days of/before the filing of her EEOC charge, the defendant would regularly task the plaintiff to do various of its other employees' work, particularly when they would not show up for work, which was frequent.

28. Ms. Orumwense essentially made the plaintiff an ad hoc supervisor without giving her a supervisory title, supervisory job description, or additional commensurate pay for the extra work she was performing; nor did the defendant give her authority over the employees she was actually supervising.

29.  Once, one of the defendant's clients contacted the defendant's office, and reported to the plaintiff that she was fearful of the HHA who had been sent to her home, because he wreaked of marijuana and was acting erratically; the plaintiff went to the client's home and saw the HHA smoking marijuana outside of it; the plaintiff reported the incident to the defendant, however to the plaintiff's knowledge, the HHA was neither disciplined or fired for his misconduct.

9

30. Orumwense violated the plaintiff's privacy, by telling  other of her employees, her family members and her business associates about the plaintiff's private medical information, including her mental health conditions; for example, on/around April 14, 2025, while the plaintiff was advising the defendant's employee, Mr. Kadai, that he was required to bring his identification to work, as was required by the Commonwealth Survey (essentially a Commonwealth inspection for compliance and certification or home health aide businesses), Kadai stated words to the plaintiff indicating that he had been made privy to her private medical conditions, which Orumwense had promised to the plaintiff that she would keep confidential.

31. Mr. Kadai, apparently not happy with the plaintiff attempting to task him to follow the Commonwealth's rules and protocol, stated words to the effect of, "you know Abby (Ms. Orumwense) is right about you.  She told me about you.  You need to be smooth with us.  You need to control your anxiety.  Don 't be so crazy."

32. The plaintiff was alarmed that Mr. Kadai, and reasonably others, based on his word choice, referring to "us", had been made privy to and knew about

her mental health issues, from Orumwense, and this caused her extreme emotional distress, and exacerbated her psychological conditions, which also potentially or did exacerbate her physical medical conditions.

33.  In 2025, Ms. Orumwense would repeatedly discuss the plaintiff with third persons, including her other employees, her sister (who would help Orumwense with the business) and other of her associates (Ms. Orumwense is well known in her local area as a prominent and influential business owner, particularly in her field, and particularly within the Nigerian-American community in that area, including in the business arena and in social circles, including with the plaintiff's own family).

34.  Ms. Orumwense would repeatedly violate the plaintiff's privacy, including within one year of the date of the filing of this complaint, by telling third persons about her private medical conditions; Orumwense would also tell third persons that the plaintiff was "crazy", that she was drunk (at work), which caused her to work with a particular gait – those aforementioned statements were patently false, which Orumwense knew, however, she made them maliciously to harm the plaintiff's professional and personal

reputations at work and in her and Orumwense's community, which occurred – these false statements were made within one year of the filing of this complaint.

35.  Additionally, Orumwense made other false statements about the plaintiff to third persons within one year of the filing of this complaint, including that the plaintiff was "incompetent", that she was "slow" or "retarded".

36.  The plaintiff perceived that the statements referred to in the preceding paragraph were referring to her psychological disabilities, and evidenced disability discrimination, and harassment based on them.

37. Orumwense made other derogatory statements about the plaintiff, which she did not make about other of her employees whom were not disabled or whom Orumwense did not perceive to be disabled, as she did the plaintiff, including disparaging and false statements about her job performance andabout her worth as an employee; for example, there was a particular incident in February 2025, when Orumwense had tasked the plaintiff to deliver work to her home.  The plaintiff did so, and upon her arrival, the plaintiff could hear Orumwense talking about her, through the door, before she knocked – Orumwense was talking to her sister and others, and she

stated that the plaintiff was undeserving of a raise, that she did not perform her work properly, that she did not teach her other employees how to properly clock into work, and that she wasted time preparing for the Commonwealth Survey, scheduled for April 2025; Orumwense continued, falsely stating that the plaintiff had not done anything to help her prepare for the "Survey"; the plaintiff, devastated by what she heard, simply left the documents at the door and left.

38. In the same incident as summarized in the preceding paragraph, the plaintiff heard Orumwense state that she was "just stupid", that she was incompetent, and that she (Orumwense) could not wait to get rid of her; the plaintiff perceived that the foregoing derogatory and false statements were based at least in part on the fact that she was psychologically disabled, or that Orumwense perceived her to be.

39. Upon reasonable information and belief, Orumwense repeated the statements in paragraphs 36 and 37 above, to third persons within one year of the date of the filing of this complaint, which were either false and/or revealed private information about the plaintiff, as well as painted the plaintiff in a false light.

13

40.  The fact that Orumwense was making disparaging and false statements about the plaintiff to third persons was confirmed on/around March 26, 2025, when the Orumwense's sister was in the defendant's office for the purpose of helping to prepare for the Commonwealth Survey – the sister seemed inexplicably irritated with the plaintiff, and she stated words to the plaintiff to the effect of, "you don't do anything" and "I don't know what you have been  doing all of this time."  Moments later, the plaintiff heard the sister talking on the telephone, and the sister stated words to the effect of (referring to the plaintiff), "bipolar" and "Serequel."

41.  Five of the plaintiff's coworkers were in the office on March 26, 2025, and they were in earshot of what Orumwense's sister was saying about the plaintiff, as stated in paragraph 39 above; the sister's was statements inferentially referred to the plaintiff's mental disability status – upon information and belief, the sister maybe a part owner of the defendant, and/or somehow employed by it, although the defendant did not reveal this information to the plaintiff.

42. Within a year of the filing of this complaint, the defendant (Orumwense) has repeatedly published to third persons, including to the plaintiff's co-

14

workers in the office or within their earshot, that the plaintiff was "crazy".

43.  On May 5, 2025, the plaintiff was having a discussion with Orumwense about her duties, at which time that she told Orumwense that it was unfair that she had to perform other employees' duties, including covering HHA's shifts; the plaintiff also complained that she was being tasked to put the HHAs on schedules that could possibly be flagged as "ghost visits" in the future;  some employees had a practice of arriving late for their assignments and leaving early from them, while falsely claiming on their timesheets that they had worked when they had not – Orumwense knew this practice was occurring and ongoing, but she did not rectify it, and allowed false information regarding hours worked to be given to the Commonwealth, for the purpose of receiving funding from it, so that she could pay her employees and stay in business.

44.  Orumwense knew that some of her employees were falsifying their time sheets/records, and she tacitly endorsed this conduct, and did not discipline the employees who did it.

45.  On May 5, 2025, the plaintiff told Orumwense that it was unfair that she was requiring her employees to work twelve hours shifts several times per

week, which was occurring – in response to the plaintiff's complaints and concerns stated that day, Orumwense told her that she must take an unpaid leave of absence due to seeming "stressed" (essentially firing the plaintiff).

46. The plaintiff perceived Orumwense's statement that she seemed stressed, to mean that she was stating that the plaintiff could not handle stress due to her disabilities; on May 5, 2025, Orumwense goaded the plaintiff, asking her if she wanted to be fired; in the same conversation, Orumwense stated words to the effect of, "do you want me to call your mother (whom Orumwense is/was friends with) and tell her to come get her "crazy" daughter.

47. Based on Orumwense telling her that she must take an unpaid leave of absence for which no return or estimated return date was stated, as well as the goading about whether she wanted to be fired, the plaintiff reasonably believed she had been fired, and she requested that Orumwense give her a termination letter, if she was being fired; Orumwense first stated that she would do so, and then she refused to do so.

16

48. Orumwense proceeded to take the plaintiff's cellphone and told her that she would not give it back until the plaintiff turned over her office keys – confirming that the plaintiff had already been fired.

49. Orumwense refused to give back the plaintiff's cellphone and she told the plaintiff that if she wanted it, that she would have to call the police, which the plaintiff did; Orumwense stated to the plaintiff, that the plaintiff was just standing there looking stupid, publicly humiliating the plaintiff, which occurred in the presence of at least one of the defendant's employees who was in the office on May 5, 2025, a Ms. Baffoe-Bonnie, who observed the occurrences summarized above.

50. A police officer did respond to the defendant's office as a result of the plaintiff's call, at which time, in his presence and in Ms. Baffoe-Bonnies presence, and perhaps other of the defendant's employees, Orumwense falsely stated that the plaintiff was "crazy" and "disgruntled" (which the plaintiff believed again pertained to virtual slurs against her based on her disabilities).

51. Orumwense continued ranting about the plaintiff, stating words to the effect of, that she did not know what the plaintiff would do, insinuating

that she might do something illegal (e.g., damage the property, etc.), or something irrational based on her psychological conditions, which was a knowingly false statement, and one which disparaged the plaintiff not only to the police office, but also to Ms. Baffoe-Bonnie, and anyone else who was in the office at the time, that day.

52. Ms. Orumwense implied that the plaintiff may act in a manner indicating mental instability and that she may be unhinged, both of which were knowingly false.

53.  The police officer instructed Orumwense to give the plaintiff a termination letter, which Orumwense stated that she would do, but she never gave the plaintiff such a letter.

54. During her employment with the defendant and withing 300 days of the filing of this complaint, the plaintiff was treated severely differently from her non-disabled co-workers, with respect to the terms and conditions of her employment, including, but not limited to, being paid several dollars less her hour then they were paid, despite that she arguably did more work than they did;  Orumwense refusing her requests for raises; being falsely criticized regarding her performance, and eventually being fired for merely

18

trying to get Orumwense to comply with legal requirements for the job, while conversely Orumwense allowed multiple employees to gravely commit misconduct by not working their assigned hours and falsely documenting time, which Orumwense falsely reported to the Commonwealth, without disciplining or correcting this conduct.

55.  Orumwense refused to give the plaintiff a raise in the context where she was having her act as an ad hoc supervisor and as an HHA, for which she had not been trained; additionally, Orumwense would have the plaintiff deliver documents to the HHAs at their assignments, which they had to execute, rather than having them come to the office to do so, and she would have the plaintiff sometimes drive HHAs to their work assignments; additionally, Orumwense hired another person as an additional secretary, whom she tasked the plaintiff to train, based on her relative lack of qualifications for the position.

56. Orumsense would tell the plaintiff, and upon reasonable belief, others, that the plaintiff was the reason that she lost clients and employees resigned, which was knowingly false, and harassed the plaintiff.

57. The defendant employees whom Orumwense treated better than the

plaintiff with respect to the terms and conditions of their employment were not disabled or perceived to be so by Orumwense; Orumwense gave them raises, while denying the plaintiff a raise.

58. The defendant's ongoing mistreatment of the plaintiff, and differential and worse treatment of her, was based on disability discrimination.

59. The defendant's actions against the plaintiff, summarized above, permeated the plaintiff's workspace with hostility, and animus, and created a hostile work environment against her based on her disability status.

60. Orumwense not only personally discriminated against the plaintiff based her disability status, but she also put in motion, encouraged and/or tolerated an onslaught of discriminatory conduct by her other employees against the plaintiff, which caused the plaintiff great psychological harm, for which a reasonably person in the plaintiff's shoes, would have been psychologically harmed.

61. Orumwense also tacitly (or not tacitly) encouraged other persons, including her business associates and friends to also harass the plaintiff, based on her disability status, and to ridicule her based on it.

62. As a result of the defendant's conduct against her, the plaintiff's mental

health conditions were extremely harmed and exacerbated, for which she had had to obtain and receive specialized mental health treatment therefore.

63. The defendant intentionally and repeatedly defamed the plaintiff within one year of the filing of this complaint, which caused the plaintiff extreme emotional distress and harmed her professional and personal reputations.

64. The defendant intentionally violated the plaintiff's privacy by revealing and publishing her private and confidential medical information to third persons and by intentionally painting the plaintiff in a false light, based on those conditions, as well as other matters, within a year of the filing of this complaint, which caused the plaintiff extreme emotional distress.

65. The plaintiff repeatedly reported to Orumwense that her employees were violating its requirements for properly and truthfully reporting their hours worked through EVV and IVR, which condition Orumwense ignored and allowed to continue to occur; Orumwense falsely certified this false time to the Commonwealth, and she retaliated against the plaintiff for detecting and reporting it and complaining about it to her, by firing the plaintiff.

66.  The Commonwealth of Pennsylvania did a survey of the defendant's

business in/around April 2025, which was essentially a compliance inspection pursuant to the requirements for home health care businesses in the Commonwealth pursuant to the requirements of 28 Pa. Code Chapter 611, including pertaining to Hiring or rostering pf direct care workers (611.51), Criminal background checks (611.52); Child Abuse Clearances (611.53), Competency requirements (611.55), and Health screening (611.56), in particular; 28 Pa. Code Chapter 611 should be cross referenced with the requirements of 55 Pa Code Section 52.15, 55 Pa. Code Section 52.19 and 55 Pa Code Section 52.20, in particular, relating to provider records, criminal history checks, and provisional hiring, respectively.

67. On/around April 7. 2025, the defendant and Ms. Orumwense reported false information to the Commonwealth, during its survey, specifically to a Ms. Jihye Lee, including false documentation of physical examinations of its employees and tuberculosis (TB) tests for employees, which had never occurred; there was also presented to Ms. Lee, false documentation regarding CPR/AED: Adult, Child, Infant + standard first aid (BLS) certification – upon reasonable information and belief, Orumwense conspired with her friend and business associate, to help manufacture this

false documentation, to obtain certification of compliance for the Survey.

68. Upon reasonable information and belief, Orumwense conspired with her sister to have her, a registered nurse, sign off on false medical documentation for employees, that the defendant gave to Ms. Lee, resulting in Ms. Lee and the Commonwealth certifying compliance on a false basis, unbeknown to them.

69. The plaintiff reported the defendant's discrepancies, and failings with Commonwealth requirements to Orumwense, who ignored her, and plowed ahead with presenting false documentation to the Commonwealth.

70. The Commonwealth certified the defendant's business on a false basis, which the defendant knew.

71. The plaintiff observed that the defendant did not provide all of its employees (or potentially none of them) with proper onboarding and training for their positions as home health aides.

72. The defendant repeatedly falsely reported the hours that its employees worked to the Commonwealth, receiving funding on a fraudulent basis.

73. The defendant repeatedly allowed particular of its employees to not have

23

to use the required Commonwealth electronic procedures for documenting their time, only requiring them to submit written time, sheets, including Mr. Kadai, and Calyster Dassin.

74. The defendant did not comply with the Commonwealth's requirements for its employees for fingerprinting, having social security cards, I-9 verification, CPR training, proof of legal residency, all of which the plaintiff reported to it (Orumwense), who ignored her, and retaliated against her for trying to help her comply with these legal requirements, by harassing the plaintiff and then by firing her.

75. The plaintiff even attempted to assist Ms. Orumwense, by creating 4-5 versions of an onboarding process over time, which would assist the defendant in meeting Commonwealth requirements for the defendant's business, which Orumwense rebuffed.

76. The defendant disingenuously stated it would adhere to state and federal legal requirements to the plaintiff, which turned out to be false – rather than correcting legal deficiencies, the defendant essentially labelled the plaintiff as a troublemaker, causing her extreme emotional distress.

77. As a result of the defendant's conduct against her, including firing her, the

24

plaintiff experienced extreme emotional distress, including, sleeplessness, panic/anxiety attacks, suicidal ideation, for which she needed immediate psychiatric care with her therapist, and for which she had to call the suicide hotline; this extreme psychological harm has exacerbated the plaintiff's physical health as well.

78.  Upon reasonable information and belief, Ms. Orumwense has continued to defame the plaintiff, share her private medical information, and paint her in a false light to third persons, who know the plaintiff, including her immediate family members,  Orumwense's family members and her business associates, akin to character assassination, and to intimidate the plaintiff from taking this legal action, including as evidenced by the plaintiff's own family members aggressively trying to intimidate her into not taking this legal action, all of which caused the plaintiff to experience more extreme emotional distress.

79. The plaintiff suffered economic harm based on the defendant's conduct, including from being denied requested raises, and termination from employment.

COUNT ONE – VIOLATION OF THE ADA AND THE ADAA BASED ON DISABILITY DISCRIMINATION

25

80. The plaintiff incorporates paragraphs 1-78 above, as though fully set forth herein.

81. The defendant discriminated against the plaintiff based on her disabilities and/or its perception that the plaintiff was disabled, with respect to the terms and conditions of her employment, including, but not limited to her rate of pay, denial of her requests for deserved raises and stipends, discipline, assessment of her work and termination from her employment, in comparison with her similarly situated co-workers, who were not disabled or perceived to be so.

82. The defendant reneged on its promise to reasonably accommodate the plaintiff for her disabilities, by intentionally subjecting her to a barrage of ongoing and undue stress, which was maliciously done to harass and harm the plaintiff, which harm did occur.

83. The defendant intentionally subjected the plaintiff to a hostile work environment based on her disabilities, which was severe and pervasive, and which was objectively hostile, negatively altering the plaintiff's terms and conditions of employment, and caused her severe psychological and emotional harm, which the defendant maliciously intended – the

defendant's conduct summarized above was by its owner, Ms. Orumwense and multiple of the defendant's employees, which Orumwense knew were harassing the defendant based on her disability status, which Orumwense knowingly endorsed it, and refused to take corrective action against.

84. The defendant fired the plaintiff based on her disability status.

WHEREORE, the plaintiff requests judgment in her favor against the defendant and she requests the following relief:

   a.  Back pay;

   b.  Front pay;

   c.  Compensatory damages;

   d.  Punitive damages;

   e.  Reasonable attorney fees and costs;

   f.  Any other relief the Court deems appropriate.

COUNT TWO – SUPPLEMENTAL STATE LAW CLAIMS FOR DEFAMATION IN VIOLATION OF 42 PA. C.S. S 8343

85. The plaintiff incorporates paragraphs 1-83 above as though fully set forth herein.

86. Within a year of the date of the filing of this complaint, the defendant (Ms.

27

Orumwense) has repeatedly published knowingly false statements as stated above about the plaintiff to third parties, including regarding her mental stability, her professional competence and performance, her conduct, and her personal ethics; additionally other of the defendant's employees have published similarly or the same false statements to third parties about the plaintiff at work, and outside of work.

87. The recipients of the defendant's defamatory statements and publications about the plaintiff were understood by their recipients to refer to the plaintiff and understood to have derogatory meanings – the false statements harmed the plaintiff reputation and would tend to make persons not wish to associate with her.

88.  The defendant's statements including by Orumwense, and her employees, which were made during and in the scope of their employment for the defendant, were made intentionally and were made maliciously to harm the plaintiff's reputation, including her professional reputation and her personal reputation, which occurred.

89. As a result of the defendant's defamation of the plaintiff, the plaintiff experienced extreme emotional distress, mental anguish, humiliation, loss

28

of enjoyment of life, and pecuniary injury.

90. The defendant's defamation of the plaintiff, included a knowingly false publication of a statement that reasonably is interpreted, that based on mental instability, she was prone to commit a crime (this occurred on May 5, 2025 at work in the presence of at least one co-worker, who upon reasonable belief, published the falsity to other of the plaintiff's co-workers, in the context of telling them how the plaintiff was fired).

91. The defendant's false publications about the plaintiff were made with malice.

WHEREFORE, the plaintiff requests judgment in her favor against the defendant, and she requests the following relief:

a. Compensatory damages;

b. Punitive damages.

### COUNT THREE – INVASION OF PRIVACY

92. The plaintiff incorporates paragraphs 1-90 as though fully set forth herein.

93. The defendant, including through Ms. Orumwense and other of her employees, in the scope and course of their employment, published

29

knowingly false and objectively offensive statements about the plaintiff to her co-workers and other third persons, including about her mental stability and her professional competence.

94. The defendant's publications were made with malice and they caused the plaintiff to experience extreme emotional distress.

95. The defendant's false publications depicted the plaintiff in a false light and harmed her reputation.

96. The defendant intentionally and maliciously published the plaintiff private and confidential medical information to its employees and other third persons, without her permission.

WHEREFORE, the plaintiff requests judgment in her favor against the defendant and she requests the following relief:

    a. Compensatory damages;

    b. Punitive damages.

COUNT FOUR – VIOLATION OF THE PUBLIC POLICY OF THE COMMONWEALTH OF PENNSYLVANIA

97. The plaintiff incorporates paragraphs 1-95 as though fully set forth herein.

98. The plaintiff reported various illegal conduct by the defendant to it,

30

including its owner pursuant to 55 Pa. Code Chapter 611 and related statutes, which are based on federal and state law, including but not limited to various requirements for home health care businesses and their employees, as summarized above.

99.  The defendant also endorsed false and fraudulent reports of the hours that its employees worked, for which it received funding from the Commonwealth to pay its employees, based on this fraud.

100.     When the plaintiff reported the afore summarized issues to the defendant (Orumwense), she rebuffed the plaintiff, including on May 5, 2025, and fired her in retaliation for complaining about them, and fired her for refusing to go along with those illegal activities.

101.     Firing an employee for reporting illegal conduct to this and third parties violates the public policy of the Commonwealth of Pennsylvania, and is an exception to its policy of "employment at will".

102.     The defendant also fired the plaintiff for opposing its illegal conduct, which violated the laws of the Commonwealth of Pennsylvania, violating the Commonwealth's public policy.

103.     The defendant's retaliatory termination of the plaintiff's employment

31

was made with malicious intent to harm her which occurred.

104.     As a result of the defendant's conduct in firing her, the plaintiff suffered severe emotional distress and economic harm.

WHEREFORE, the plaintiff requests judgment in her favor against the defendant and she requests the following relief:

a.  Back pay;

b.  Front pay;

c.  Compensatory damages;

d.  Punitive damages;

e.  Any other relief the Court deems appropriate.


Respectfully submitted,


/s/ Reginald Allen, Esquire